UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      CASE NUMBER: 10-20123
                                               HONORABLE VICTORIA A. ROBERTS

v.

DAVID BRIAN STONE, ET. AL.,

        Defendant.
                                                 /

**ORDER GRANTING DEFENDANTS' MOTION TO PRECLUDE
TESTIMONY OF GOVERNMENT EXPERT MICHAEL BARKUN**

**I.    INTRODUCTION**

This matter is before the Court on Defendant David Brian Stone's Motion to Preclude Government's "Expert Witness" Michael Barkun and for *Daubert* Hearing. (Doc. # 532).  Defendants Michael Meeks, Tina Mae Stone, Thomas Piatek, Joshua Stone, David Stone, Jr., and Kristopher Sickles join (Doc. #s 539, 543, 548, 554, 558, 566).

The Court **GRANTS** Defendants' motion to exclude Dr. Barkun.

**II.    BACKGROUND**

Defendants are charged with: (1) Seditious Conspiracy (18 U.S.C. § 2384); (2) Conspiracy to use Weapons of Mass Destruction (18 U.S.C. § 2332a(a)(2)); (3) Use and Carrying of a Firearm During and in Relation to a Crime of Violence (18 U.S.C. § 924(c)(1)); and (4) Possessing a Firearm in Furtherance of a Crime of Violence (18 U.S.C. § 924(c)(1)).  In addition, Defendants David Stone, David Stone, Jr., and Joshua

1

Stone are charged with various other weapons-related offenses.

On November 30, 2011, the Government notified Defendants that it intended to call an "Academic Expert," Professor Michael Barkun, to testify concerning his research into conspiracy belief and theories. In response to Defendants' motion to preclude Dr. Barkun's testimony, the Government admitted that a hearing pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ("*Daubert* hearing") was necessary to test the admissibility of Professor Barkun's testimony.

Before the hearing, the Government provided Defendants with a longer, more concrete Rule 16(a)(1)(G) summary of Dr. Barkun's proposed testimony, containing notice that Dr. Barkun will testify about conspiracy subcultures, beliefs and theories; and theories such as "stigmatized knowledge," "New World Order" and the "Illuminati." The Government also intends to ask Dr. Barkun questions to elicit conspiracy theorists' beliefs about the history behind Federal Emergency Management Agency ("FEMA") detention centers and the role of the internet in spreading conspiracy belief literature and thought. Dr. Barkun also plans to testify about significant events in conspiracy belief and how conspiracy theorists view these events. The events listed in the Rule 16 summary include: Ruby Ridge, Waco, the Oklahoma City bombing and the 9/11 attacks.

The Government states:

> As he testifies about each of the concepts above, Professor Barkun will also be asked whether he has reviewed some of the materials seized during the search warrants executed at the defendants' residences and some of the recorded conversations and whether this material is consistent with the conspiracy beliefs about which he is testifying. The government found a great deal of material in numerous locations which espouse these beliefs, shedding light upon the defendants' intent and motive, as well as linking the co-conspirators to the goal of the charged conspiracy in Count One.

2

(Doc. # 532-1; Government's November 30, 2011 Expert Witness Disclosure Notice at 4).

The Court held a *Daubert* hearing on January 26, 2012. Dr. Barkun's testimony at the hearing largely tracked what is stated in the Government's Rule 16 summary. The Government argued that Dr. Barkun's testimony helps establish Defendants' "motive and intent" under Count I of the Second Superseding Indictment (Seditious Conspiracy). It said Defendants' cross-examination of the professor – which largely attacked the relevance of his research and background to the facts of this case – goes to the weight of the professor's testimony, not its admissibility. Defendants argue that Dr. Barkun's proposed testimony violates Fed. R. Evid. 704(b), which prohibits an expert witness in a criminal case "from stating an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense" because "[t]hese matters are for the trier of fact alone." FED. R. EVID. 704(b). Defendants also argue: (1) the Government did not establish that Dr. Barkun's testimony was necessary under Fed. R. Evid. 702; (2) Dr. Barkun's testimony is not relevant to the facts the Government must prove; and (3) even if relevant, the probative value of Dr. Barkun's testimony is substantially outweighed by the considerations outlined in Fed. R. Evid. 403.

### III.  APPLICABLE LAW AND ANALYSIS

#### A.  General Principles

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under the rule:

> A witness who is qualified as an expert by knowledge, skill, experience,

> training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The rule reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (citing Fed. R. Evid. 702 advisory committee's notes, 2000 amend.).

Rule 702, *Daubert*, and *Kumho Tire*, together, establish that proposed expert testimony is admissible if that testimony satisfies three requirements. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528-29. "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' *Id*. Third, the testimony must be reliable. *Id*." *Id.* at 529.

The Court's gatekeeper role is to ensure that expert testimony meets these three requirements. See *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed. Appx. 479, 483 (6th Cir. 2002) (the *Daubert* Court held judges are to serve a gatekeeper function with respect to expert testimony). To be relevant, expert testimony must "fit" with the issues to be resolved at trial. *See Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999). The reliability requirement focuses on the methodology and principles underlying the testimony. *Id.* The proponent of the evidence – in this case, the Government – must establish admissibility by a preponderance of the evidence. *Nelson v. Tennessee Gas Pipeline, Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509

U.S. at 592 n. 10).

   B.  **Dr. Barkun's testimony is largely irrelevant**

One of Defendants' arguments is Dr. Barkun's testimony will not assist the jury, as required by Rule 702.  (*See* Doc. # 621, Defendant's Reply Brief at 4-6).  The Court agrees.  At the *Daubert* hearing, the Government insisted it would use Dr. Barkun's testimony as evidence of Defendants' "intent and motive" to forcibly and violently oppose the Government under the Seditious Conspiracy count.  However, the Government failed to connect the proposed expert testimony to the issues in dispute under that count.

For instance, Defendants asked the professor whether there is any literature on what people who read the conspiracy belief books, charts and other items seized from some of the Defendants' homes, do with the information contained there, i.e, whether studies demonstrate whether these individuals lead normal lives or act out violently pursuant to their beliefs.  Dr. Barkun replied that he is not aware of such studies.  Similarly, when asked whether it was possible to predict what a conspiracy theorist will ultimately do with his or her beliefs, Dr. Barkin admitted it was impossible to predict.

Dr. Barkun could not opine on the number of conspiracy belief-related books a person must have, to become a conspiracy theorist, except to say it would have to be a lot.  Defendants made the point that Dan Brown, the popular author of *The Da Vinci Code* and *Angels and Demons*, writes in his books about the same concepts and beliefs in the literature on which the professor's testimony is based.  Yet, it would be inaccurate to suggest that everyone who reads Dan Brown is a conspiracy theorist.  More importantly, even if they are, the Court cannot make the additional required leap that

conspiracy theorists will commit acts of violence simply because of their beliefs, or something they read in a Dan Brown novel.

Simply put, the nexus between the testimony the Government proffers through Dr. Barkun and the crimes charged is speculative at best. Dr. Barkun's explanation of conspiracy theories and his opinion on whether or not items seized from Defendants' homes are consistent with these theories will not aid the jury in determining whether Defendants agreed and intended to forcibly oppose the United States Government. As Defendants argued at the hearing, the crime charged is one of action, not advocacy. It is neither necessary nor sufficient that Defendants believe in conspiracy theories to be found guilty of Seditious Conspiracy.

This is not a case about the New World Order, the Illuminati, stigmatized knowledge or any other conspiracy theory or concept. This is so even though some of these concepts might be tangentially related to the crime charged, as stated in the indictment. (*See, e.g.*, Doc. # 293, Second Superseding Indictment at ¶ 8 (alleging that the Hutaree views its enemies as participants in the "New World Order," which the Hutaree intends to oppose by force)). It is a case about an alleged agreement to violently overthrow the Government. There is no place for Dr. Barkun's proposed testimony, which the Court must treat with more caution than that of a lay witness because, as an expert, he need not have personal knowledge about the case to testify. *See Coal Res., Inc. v. Gulf Western Indus., Inc.*, 954 F.2d 1263, 1273 (6th Cir. 1992) ("The admissibility of an expert's opinion under Fed. R. Evid. 703 does not depend upon the witness having personal knowledge concerning the details of every constituent element of the opinion.").

The absence of fit between Dr. Barkun's proposed testimony and the issues is exemplified by some of the topics covered in the Government's Rule 16(a)(1)(G) summary and during the hearing. These include: the history of FEMA detention centers; the standoff at Ruby Ridge; the standoff at Waco, Texas; the Oklahoma City bombing; and the September 11, 2001 attacks in New York and Washington, D.C. ("9/11 attacks"). The Government does not allege that Defendants were involved in these occurrences; they are not relevant to the facts alleged in the indictment.

The Court is unpersuaded that these topics are relevant even though the Government proposes only to show that conspiracy theorists believe the United States Government was behind these events. Dr. Barkun admitted that there are multiple and distinctive descriptions of the terms and concepts addressed at the hearing and that the Government's summary of his testimony does not include them all. He admitted that not all conspiracy theorists hold the same views and that some may hold some of the views described in the summary, but not others. As explained more fully below, exploration into these topics would not only lead the trial way off-track, but would likely confuse and mislead the jury.

A similar result was reached in *United States v. Amawi*, 552 F.Supp.2d 669 (N.D. Ohio 2008) (C.J. Carr). Defendants there were charged with conspiring to kill and maim American service personnel in Iraq and providing material support and resources to persons seeking to kill U.S. Nationals outside the United States. The district court excluded two proffered defense experts. The first, Reza Aslan, was a doctoral student completing his dissertation on *Jihadism as a Social Movement*. *Id.* at 672. A defendant, Mohammed Zaki Amawi, proposed to have him testify about: (1) the origin

7

and development of Islam and emergence of the concept of jihad; (2) the concept of jihad and its variations; (3) the Salafist movement and its current iteration; (4) the rise of the contemporary jihadist social movement and political ideology; (5) how jihadism has become a global social movement, similar to other contemporary social movements; and (6) how contemporary global social movements function. *Id.* at 673. Amawi believed Aslan's testimony was necessary to a fair trial; Amawi said the testimony was relevant to his state of mind when he made certain comments and engaged in conduct underlying the indictment. *Id.* He argued, "[i]f not permitted to gain a more full and accurate understanding of Islam, the jurors...cannot evaluate the defendant's statements and actions in a proper context." *Id.*

The court rejected this argument:

> I agree with the government that, as thus projected, the proffered testimony does not relate to facts in issue. Just as this case is not about "Terrorism" writ large, it is not about Islam or jihadist movements generally. Indeed, if this testimony were admitted, the door would be opened to admitting far more of [Government expert] Kohlmann's proposed testimony than I continue to consider appropriate about the origin, nature, functioning, actions and goals of various specific jihadist groups. Moreover, even if, as Aslan will relate, various "global social movements" function, in general, in modes, the nexus between such ways and modes and these defendants is either non-existent or simply too speculative to permit his testimony.

*Id.* at 674.

The court also excluded proffered expert Jon Alterman, who had extensively researched and published on Middle Eastern affairs. *Id.* at 674-75. Amawi proposed to have Alterman testify about: (1) the geography and geo-political dynamics in the Middle East; (2) Middle Eastern cultural norms likely to be unfamiliar to Americans; (3) conversational conventions in spoken Arabic; (4) Middle Eastern public opinion as of

2004 toward the American invasion of Iraq and the insurgency in that country; (5) doubts among many in the Middle East that Muslims committed the 9/11 attacks in the United States; (6) Muslim-Arab views towards Osama bin Laden; (7) the limited involvement of Jordanians in the Iraqi insurgency; (8) the rise, status and programming of "new media" in the Middle East; (9) the function of jihadist videos in the Arab world; and (10) how and why youth in the Middle East seek out and view jihadist videos. *Id.* at 675.

The defendant said he would "be 'demystified' by this testimony, which will set his outlook, views and attitudes in a cultural context." *Id.* He wanted to show the jury that his views "were commonplace and widely shared." *Id.* He argued, "[a]n understanding of the rise of the Arab 'new' media, from which he obtained his downloaded videos, and its widespread effect on younger persons in the Arab world will...explain those activities on his part." *Id.*

The court responded largely in the same way as it did to Aslan:

> [The proposed testimony] involves matters that are ancillary to the issues in the case, and to what the jury must decide. Middle Eastern cultural norms, attitudes toward the United States–especially after the 2003 invasion of Iraq–views about 9/11 and Osama bin Laden, and the new media and its impact on younger person in the Arab world can, at most, possibly give insight into Amawi's mind set. But even that possibility is speculative. Whether his views and their origins conform to those held by others like him elsewhere does not matter. This is a case about what he and codefendants did, and whether what they did violated American law.

*Id.*

The court treated the government's proposed expert on terrorism and terrorist groups in the same fashion. The court noted that "[t]he government does not allege that any organized terrorist or insurgent organization solicited the defendants to commit the

9

crimes charged to them." *Id.* at 671. The court opined:

> This case involves, in part, the government's claim that the defendants conspired to kill or maim U.S. Nationals [i.e., American service personnel] in Iraq, and that they conspired to provide material support or resources to others seeking to kill American service personnel in that country. "Terrorism" generically, or as practiced specifically by various groups with which the defendants have no connection, is not, however, a proper subject for evidence in this case. This is particularly true with regard to groups not alleged to be active in Iraq. In my view, it is of crucial importance that the evidence in this case relate to what the indictment charges, criminal code prohibits and penalizes, and defendants did and wanted to do, rather than what others, with whom the defendants had no affiliation, have done, continue to do and want to do. This is so, even though, according to the government, the defendants held views similar to, and perhaps in accordance with, those other groups and persons, and viewed their objectives and goals favorably.

*Id.*

Judge Carr's reasoning applies with equal force here. "'[Conspiracy theory]' generically, or as [adopted] specifically by various groups with which [Defendants] have no connection is not [ ] a proper subject for evidence in this case." *Id.* Although some Defendants may hold views in accordance with some or all of the conspiracy beliefs Dr. Barkun described at the hearing, they are not on trial for holding unpopular beliefs. It is important that the evidence relate to what the indictment charges.

### C. Dr. Barkun's testimony is inadmissible under Fed. R. Evid. 403

Not only is Dr. Barkun's proposed testimony largely irrelevant, any probative value it has is substantially outweighed by the danger of undue prejudice, and the risk that the jury will be confused and misled. *See* FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

10

One reason why Judge Carr excluded portions of the government's expert's testimony in *Amawi* was "the grave risk of undue and unfair prejudice to the defendants." 552 F.Supp.2d at 672. The court noted that by introducing testimony about terrorist groups active in the Middle East and elsewhere and to which the defendants had no connection, the government would "invariably suggest to the jury that somehow" the defendants were involved with these groups. *Id.*

The court also held that the probative value of the proposed testimony of defense expert Aslan was outweighed by the risk of confusing the issues:

> Even if [ ] the proffered testimony would give some insight into Amawi's mind set and thus what he meant by his religious/political statements, its probative value as to his intent is substantially outweighed by its tendency to confuse the issues in this case. As noted, this is not a case about Islam, jihadist movements or Terrorism. This is a case about whether specific acts violated federal criminal laws. To dwell, even briefly, on the history of Islam and rise of "global social organizations" would, however, "suggest to the jury that those subjects might have, some place in their deliberations. If nothing else, this would conflict sharply with the extensive efforts during voir dire to make certain that neither the jurors' nor the defendants' religious views would affect the jury's delibera-tions.

*Id.* at 674.

The court held that Alterman's proposed testimony would also confuse the issues:

> [A]s with Aslan's testimony, this testimony would confuse the issues. This is not a case about the rise and role of new media in the Arab world. To be sure, the internet was the source of the videos in evidence; but it is hardly likely that the jurors need assistance of an expert to understand how Amawi came to possess those videos. Those videos are, in any event, what they are, and no elaboration is needed to understand that fact. This is likewise not a case about Arab attitudes or geo-political dynamics in the Middle East. Whatever probative value there might be to evidence about those attitudes and their origins, such value would be substantially outweighed by the risk of confusion of the issues for the jury.

11

*Id.* at 675.

Similarly, the topics on which the Government proposes to have Dr. Barkun opine are ancillary to the real issues here. While these topics might give some insight into Defendants' frame of mind, and while Defendants may have believed members of law enforcement to be participants in the New World Order as alleged by the Government, the risk of confusing the issues is too grave to allow the testimony.

Introduction of topics bearing little relation to whether Defendants conspired to forcibly and violently overthrow the Government – such as the Oklahoma City bombings and the 9/11 attacks – would likely lead the jury to believe that Defendants are somehow connected to these unrelated events. Even if the jurors understand that Defendants were not involved in these attacks, there is a risk that they will believe that Defendants' views about them have a place in their deliberations – that Defendants' beliefs alone are a part of the unlawful conduct underlying the charges. In a case where First Amendment freedom of expression concerns are at issue and the constitutionality of the charges has been hotly contested, the Government should take care not to infect the trial with considerations on which the jury cannot rely to convict. Again, this is not a case about conspiracy theories; any suggestion to the jury that it is, is inappropriate.

D.  **The Government's cases are inapposite**

Lastly, the Court addresses the cases the Government relied on in its response to Defendants' motion. (Doc. # 575). Citing *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998), *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) and *United States v. Tocco*, 200 F.3d 401 (6th Cir. 2000), the Government says, "Mr. Barkun's education and experience can unlock the meaning and provide juror's a window into [ ] apocalyptic

12

world view, and the belief that massive conspiracies are at work to subvert and oppress an individual's freedom, in ways similar to expert witness testimony concerning terrorism or organized crime." (*Id.* at 5-6).

These cases are not helpful to the Government. In *Salameh*, the Second Circuit addressed the admissibility of "terrorist materials" seized from the defendants in a case arising out of the bombing of the World Trade Center in New York City. 152 F.3d at 111. The court did not address the admissibility of expert testimony, holding only that the materials were not unduly prejudicial in light of their probative value – that is, their ability to "provide[ ] background information necessary to the jury's understanding of the nature of the conspiratorial agreement." *Id.* It held that the evidence could "furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (citation and quotation marks omitted).

Importantly, the evidence introduced in *Salameh* was not expert testimony only tangentially related to the charges in the indictment. It was, for the most part, literature on bomb-making and destroying buildings with explosives; thus, it bore a similarity to the actual events at the World Trade Center and could be used to establish "motive and intent to bomb targets in the United States." *Id.* Dr. Barkun's testimony, on the other hand, is not needed to assist the jury in understanding the nature of the alleged conspiracy. The nexus between conspiracy beliefs in general and the charges in the indictment is tenuous. Therefore, *Salameh* is inapposite.

*Farhane* is likewise distinguishable. There the defendant, Rafiq Sabir, was charged with conspiring to provide and providing or attempting to provide material support to a terrorist group, al Qaeda. 634 F.3d at 132. The Second Circuit upheld the

district court's decision to admit the expert testimony of terrorism expert Evan Kohlman. *Id.* at 158-60. Kohlman knew a lot about al Qaeda – the specific group to which Sabir allegedly provided assistance. *See id.* at 158-59 (describing the factual basis for Kohlmann's proposed expert testimony). Kohlman provided background information on al Qaeda, not simply on terrorist groups in general. Dr. Barkun does not propose to tell the jury about the "background and structure" of Hutaree. *Id. at 159.* He does not profess to have any specialized knowledge or expertise on the inner-workings of the Hutaree. Thus, the background information Dr. Barkun would provide would not be nearly as relevant or as helpful as that of Kohlmann in *Farhane*.

The Government's reliance on *Tocco* is misplaced for the same reason. The defendant-appellant in *Tocco* was convicted of two counts of conspiracy in violation of the Rackateering Influenced and Corrupt Organizations Act (RICO) and one count of conspiracy to interfere with commerce by extortion in violation of the Hobbs Act. 200 F.3d at 410. The charges arose from the defendant's involvement in a group called "Cosa Nostra" (also known as "the Mafia").

The government's expert, Samuel J. Ruffino, testified at trial as an expert on organized crime. *Id.* at 418-19. Ruffino testified about the structure, rules and organization of Cosa Nostra, as well as the interpretation of phrases and jargon heard at trial and the hierarchy and roles of the organization's members. *Id.* at 418. The Second Circuit upheld the admission of the expert testimony, observing "[t]his type of evidence regarding the inner-workings of organized crime has been held to be a proper subject of expert opinion...." *Id.* at 419. It also observed that Ruffino was qualified on the subject about which he testified "by his extensive experience in the investigation of

organized crime in the Detroit area, including 22 years with the FBI, 17 of which were spent in organized crime investigations, and his role since 1990 as the Cosa Nostra coordinator for the Detroit division...." *Id.*

In contrast to Ruffino's extensive experience and familiarity with Cosa Nostra, Dr. Barkun does not profess to have experience and familiarity with the Hutaree. Although the Government wishes to use Dr. Barkun to aid in establishing the Hutaree's "motive and intent," the professor can only do so by discussing matters largely outside of the facts of this case and by generalizing views which he admits are sometimes divergent or only partially held. Like *Farhane*, *Tocco* is distinguishable on its facts.

## IV. CONCLUSION

The Court **GRANTS** Defendants' motion to preclude Dr. Barkun's proposed expert testimony. It is largely irrelevant to the issues in dispute and what little probative value it might add is substantially outweighed by the risks of undue prejudice, confusion and misleading the jury.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: January 30, 2012

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 30, 2012.

S/Linda Vertriest
Deputy Clerk