UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff

Case No. 2: 10-cr-20123

HONORABLE VICTORIA ROBERTS

-vs-

D-7 THOMAS WILLIAM PIATEK,

          Defendant

_____/

TRIAL BRIEF RE: THE "IN
FURTHERANCE" REQUIREMENT
OF RULE 801 (d)(2)(E) OF
THE FEDERAL RULES OF EVIDENCE

ARTHUR JAY WEISS (P 25225)
Attorney for Defendant PIATEK
30445 Northwestern Highway
Suite 330
Farmington Hills, Michigan 48334-3102
(248) 855-5888
arthurweiss@ajweisslaw.com

## TABLE OF AUTHORITIES

Page

FEDERAL CASES

Anderson v United States 417 US 211,
          94 S Ct 2253, 41 L Ed 2d 20
          (1974).                                          1

Fiswick v United States, 329 US 211,
          67 S Ct 224, 91 L Ed 196
          (1949).                                          2

Krulewitch v United States, 336 US 440,
          69 S Ct 716, 93 L Ed 790 (1949).                 1,7

United States v Annunziato, 293 F 2d 373
          (2d Cir 1961), cert denied, 368 US 919,
          82 S Ct 240, 7 L Ed 2d 134 (1969).               11,12

United States v Baker, 98 F 3d 330,
          (8th Cir 1996).                                  1

United States v Birnbaum, 337 F 2d 490
          (2d Cir 1964).                                   9,10,11,12

United states v Borelli, 336 F 2d 376
          (2d Cir 1964).                                   12

United States v Compagna,146 F 2d 524
          (2d Cir 1944).                                   12

United States v Darden, 70 F 3d 1507
          (8th Cir 1995).                                  2

United States v Darwich, 337 F 3d 645
          (6th Cir 2003).                                  2,3

United States v DiRodio, 565 F 2d 573
          (9th Cir 1977).                                  2

United States v Dorn, 561 F 2d 1252
          (7th Cir 1977).                                  1

TABLE OF AUTHORITIES (Continued)

Page

FEDERAL CASES (Continued)

United States v Eaglin, 571 F 2d 1069,
    (9th Cir 1977).                1

United States v Eubanks, 591 F 2d 513
    (9th Cir 1979).                2, 10, 16, 17

United States v Fielding, 630 F 2d 1537
    (9th Cir 1980).                13

United States v Goodman, 129 F 2d
    1009 (2d Cir 1942).            2, 12

United States v Green, 600 F2d 154
    (8th Cir 1979).                5

United States v James, 510 F 2d 546
    (5th Cir 1975).                2

United States v Johnson, 927 F 2d 999
    (7th Cir 1991).                9

United States v Kessler, 430 F 2d 1246
    (5th Cir 1976).                4

United States v Kindle, 925 F 2d 272
    (8th Cir 1991).                17

United States v Lang, 589 F 2d 92
    (2d Cir 1978).                6

United States v Lieberman, 637 F 2d 95
    (2d Cir 1980).                8

United States v Marks, 585 F 2d 164
    (6th Cir 1978).                1

United States v Meacham, 626 F 2d 503
    (5th Cir 1980).                2

TABLE OF AUTHORITIES (Continued)

Page

FEDERAL CASES (Continued)

United States v Montgomery, 582 F 2d
 514 (9th Cir 1978). 2

United States v Moore, 522 F 2d 1068
 (9th Cir 1975), cert denied, 423
 US 1049, 96 S Ct 775, 46 L Ed
 2d 637 (1976). 4

United States v Smith, 578 F 2d 1227
 (8th Cir 1978). 1

United States v Warman, 578 F 3d 320
 (6th Cir 2009). 2

United States v Williams, 989 F 2d
 1061(9th Cir 1993). 5

United States v Wilson, 490 F Supp
 713 (ED Mich 1980). 12

United States v Wolf, 839 F 2d 1387
 (10th Cir 1988). 2

Van Riper v United States, [13 F 2d 961
 (2d Cir 1926), cert denied sub nom
 Ackerson v United States, 272 US 702,
 47 S Ct 102, 71 L Ed 848 (1926). 12

Wong Sun v United States, 371 US
 471, 83 S Ct 407, 9 L Ed 2d
 441 (1963). 2,7


FEDERAL RULES OF EVIDENCE

FRE 801 (d) (2) (E) 1,2,3,4,5,6,7,8,9,12,13,16

## TABLE OF AUTHORITIES (Continued)

Page

UNITED STATES CONSTITUTION

Sixth Amendment                                                          1,13,15,17

SEONDARY AUTHORITIES

Comment, The Hearsay Exception for
    Conspirators' Declarations,
    25 U Ch L Rev 530, 541 (1958).                                   1

J Weinstein & M Berger, Weinstein's Evidence
    (1979).                                                           1,9

Rule 801 (d)(2)(E) of the Federal Rules of Evidence provides "a statement by a co-conspirator of a party during the course and in furtherance of conspiracy" is not hearsay. (Emphasis added). The inclusion of the "in furtherance" requirement by the Advisory Committee was motivated by their recognition of "the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence."[1] 4 J. Weinstein and M. Berger, Weinstein's Evidence, ¶ 801 (d)(2)(E) [01] at 801-171 (1979) (Footnote omitted); United States v Dorn, 561 F 2d 1252, 1256 (7th Cir 1977); Comment, The Hearsay Exception for Conspirators' Declarations, 25 U Ch L Rev 530, 541 (1958).

Furthermore, this criterion is consistent with the common-law notion expounded by the United States Supreme Court in Krulewitch v United States, 336 US 440, 443-444, 69 S Ct 716, 93 L Ed 790 (1949).

> The prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by federal courts. (Emphasis added). See also, Anderson v United States 417 US 211, 94 S Ct 2253, 41 L Ed 2d 20 (1974); United States v Smith, 578 F 2d 1227 (8th Cir 1978).

In other words, "[a] statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy; instead, the statement must 'somehow advance the objectives of the conspiracy.'" United States v Baker, 98 F 3d 330, 336 (8th Cir 1996) (Citation omitted).

---

[1] In addition to the determination of whether the proferred testimony is hearsay, an evaluation must also be made to ascertain if the evidence would violate the accused's confrontation rights under the Sixth Amendment. United States v Marks, 585 F 2d 164 (6th Cir 1978); United States v DiRodio, 565 F 2d 573 (9th Cir 1977). In fact, mere "[a]dmissibility under the co-conspirator exception to the hearsay rule does not…automatically demonstrate compliance with the confrontation clause." United States v Eubanks, 591 F 2d 513, 521 n 8 (9th Cir 1979); United States v Eaglin, 571 F 2d 1069, 1083 (9th Cir 1977).

1

Consequently, not all statements made by a co-conspirator can be considered to have been made in furtherance of the conspiracy. Fiswick v United States, 329 US 211, 67 S Ct 224, 91 L Ed 196 (1949); United States v Montgomery, 582 F 2d 514 (9th Cir 1978); United States v D Rodio, 565 F 2d 573 (9th Cir 1977). Rather, "mere conversation between conspirators" or "merely narrative declarations" are not admissible as declarations in furtherance of the conspiracy. United States v James, 510 F 2d 546 (5th Cir 1975); United States v Goodman, 129 F 2d 1009 (2d Cir 1942). Accordingly, "[f]or declarations to be admissible under the co-conspirator exception, they must further the common objectives of the conspiracy." United States v Eubanks, 591 F 2d 513, 520 (9th Cir 1979). See also, Wong Sun v United States, 371 US 471, 490, 83 S Ct 407, 9 L Ed 2d 441 (1963); United States v Meacham, 626 F 2d 503, 510-511 n 8 (5th Cir 1980); United States v Montgomery, 582 F 2d 514, 518-519 (10th Cir 1978).

Therefore, a "statement [is] inadmissible against [a co-conspirator] under the co-conspirator exception because it is mere narrative and does not further the conspiratorial objectives...." United States v Wolf, 839 F 2d 1387, 1395 (10th Cir 1988) (Citation omitted).

> "A statement is 'in furtherance of' a conspiracy if it is intended to promote the 'objectives of the conspiracy.'" United States v Henderson, 307 Fed Appx 970, 977 (6th Cir 2009) (quoting [United States v] Clark, [18 F 3d 1337, 1342 (6th Cir 1994)]....On the other hand, "mere idle chatter or casual conversation about past events is not considered a statement in furtherance of the conspiracy." See United States v Darwich, 337 F 3d 645, 657 (6th Cir 2003).... United States v Warman, 578 F 3d 320, 338 (6th Cir 2009).

In United States v Darden, 70 F 3d 1507, 1529 (8th Cir 1995), appellant "Lewis challenge[d] the admissibility of tape recordings of conversations between [co-defendant] Willie Dixon and [government informant] Earl Parnell."

> For the recordings to be admissible under Rule 801 (d) (2) (E), the only basis for admissibility argued by the government, the declarants on these tapes, Dixon and

2

Parnell, both must be co-conspirators of the defendants.  Additionally, they must both be making their statements during the course of and in furtherance of the conspiracy.  The government's evidence clearly showed that Dixon was a member of the single conspiracy charged in the Superseding Indictment.  His statements were properly admitted under Rule 801 (d) (2) (E) because his participation in the ongoing conspiracy continued and because his statements were in furtherance of the conspiracy.

*                                   *                                   *

Earl Parnell, however, was on the same tape recordings.   His statements are not admissible under Rule 801 (d) (2) (E) because he was a government informant rather an a co-conspirator at the time the statements were made and, obviously, the statements were not made in furtherance of the conspiracy.  See United States v Smith, 578 F 2d 1227, 1233 (8th Cir 1978) (holding inadmissible under Rule 801 (d) (2) (E) statements of co-conspirator turned government informant made after declarant agreed to assist government because declarant was no longer member of conspiracy).  Id at 1529-1530.

An analogous situation was presented in United States v Darwich, 337 F 3d 645, 651 (6th Cir 2003) wherein Orland Rush proffered testimony regarding his "drug dealings" with Mr Darwich.

> Rush testified that he bought nickel bags from Darwich for his personal use "basically every day" over the course of approximately nine months prior to Rush's arrest....He also testified when he needed extra money he would buy anywhere from one-half of an ounce to one pound for further resale during the same nine month time frame.  Rush further testified that Darwich sold approximately a pound of marijuana each day.  When questioned as to how he arrived at this figure, Rush noted that his nephews...worked as marijuana baggers at Darwich's home and that they would sometimes tell him that they bagged from one to two pounds at night.  Id at 651 (Footnotes omitted).

On appeal, the Sixth Circuit, cognizant "Rush's testimony that his nephews sometimes told him how many pounds of marijuana they bagged at night when he picked them up or happened upon them the next day" constituted hearsay, FRE 801 (c), Id at 657, but was not admissible within the parameters of FRE 801 (d) (2) (E), Id at 657-658.

> [W]e do not question that a conspiracy existed or that Darwich was an active participant in the conspiracy.  However, we conclude that Rush's nephews' statements were not made in furtherance of the conspiracy...It is apparent from the transcripts of Rush's testimony that these  statements were casual conversations about past events.  Rush's testimony itself indicates that his

3

nephews made these statements only occasionally; if he happened to pick up his nephews or see them in passing, they "sometimes" mentioned to him how much marijuana they had bagged the previous night…In sum, these statements are simply casual conversation-indicative of how hard the nephews worked on a particular evening and , other than the illegal nature of the work, are no different than a statement by a farmer that he harvested forty acres of wheat by sundown. Because Rush's testimony with respect to his nephews' out-of-court statements is hearsay that does not fall within an exception of the general rule, it was error for the district court to rely on this evidence. Id at 657-658 (Footnote omitted).

Similarly, a statement by a co-conspirator is inadmissible under Rule 801 (d) (2) (E) if the declarant, at the time of the statement, "was working on a 'frolic' of his own," United States v Kessler, 430 F 2d 1246, 1256 n 16 (5th Cir 1976), In the same vein, a "casual admission of culpability" is inadmissible inasmuch as it in no way furthers the conspiracy or assists in achieving the conspirator's objectives, United States v Moore, 522 F 2d 1068, 1077 n 5 (9th Cir 1975), cert denied, 423 US 1049, 96 S Ct 775, 46 L Ed 2d 637 (1976).

In United States v Moore, supra, Appellant Floyd Moore was convicted, inter alia, of conspiracy to sell United States government property, in violation of 18 USC §§ 371 and 641. The government alleged the existence of a scheme to steal hand tools from a naval supply facility and sell them to wholesale tool dealers. One of the other participants, according to the government, was co-conspirator/co-defendant Frank Rezabek.

Mr. Moore's principal contention on appeal concerned the admission into evidence of a statement reportedly made by Rezabek to a government witness, Hellerud, who was a tool dealer.

> The prosecutor asked: "Now, what did Rezabek tell you about the tools?" Hellerud answered: "Well, he said if he had to go legitimate, that he would have to go legitimate, that he would have to get out of the business." Id at 1074.

Subsequently, during the cross-examination of Hellerud by Rezabek's attorney, Hellerud was again questioned regarding this conversation, and stated:

4

He [Rezabek] said if had to go legitimate, he would have to quit. "We would have to quit," he says. Id at 1075.

In proferring this testimony, the government argued it was admissible under, inter alia, Rule 801 (d) (2) (E), "as declaration of co-conspirator." Id at 1076. However, the United States Court of Appeals for the Ninth Circuit disagreed and reversed the convictions.

> We can suggest no reasonable interpretation of Rezabek's statement, or the facts surrounding its making, that could lead us to believe that the statement was somehow "in furtherance of" the conspiracy. There is nothing to support a conclusion that Rezabek, by making the statement, was seeking to induce Hellerud to deal with the conspirators or in any other way to cooperate or assist in achieving the conspirators' common objectives. Cf, United States v Knippenberg, 502 F 2d 1056, 1061 (7th Cir 1974); Salazar v United States v 405 F 2d 74 (9th Cir 1968). Rather, the statement was, at best, nothing more than Rezabek's casual admission of culpability to someone he had individually decided to trust. Id at 1077 (Footnote omitted) (Emphasis added).

Furthermore, in United States v Williams, 989 F 2d 1061, 1067 (9th Cir 1993), the issue was, inter alia, the admissibility, pursuant to FRE 801 (d) (2) (E), of a co-conspirator telling the appellant's live-in girlfriend, "he was angry with Williams because Williams hadn't treated him like a 'partner.'" (Citation omitted).

> In determining whether a statement is made "in furtherance of" a conspiracy, the court looks to the declarant's intent in making the statement, not the actual effect of the statement. United States v Zavala-Serra, 853 F 2d 1512, 1516, (9th Cir 1988).
>
> *               *               *
>
> The [pertinent] statement was incorrectly admitted as a statement in furtherance of the conspiracy. Although [the girlfriend] knew of his boyfriend's drug dealing, the record does not support a finding that she was a coconspirator. Nor can it be said that the statement, which was essentially an expression of frustration to a confidante, was an attempt to further an objective of the drug conspiracy or set a transaction in motion. Id at 1068.

Moreover, in United States v Green, 600 F2d 154, 156 (8th Cir 1979), appellants Richard Green and Lucille Brown had been convicted of "conspiracy (1) to possess checks stolen from the mail and (2) to forge and utter United States Treasury checks," 18 USC § 371, and " a

5

substantive count of possession of checks stolen from the mail," 18 USC § 1708. At trial, Loretta Johnson, an unindicted co-conspirator, testified on behalf of the government how they (herself, the appellants and others) obtained state and federal checks, secured false and bogus identification cards, forged endorsements on the checks and then cashed them.

Over objection, Ms. Johnson was permitted to testify "Donald Patterson [a co-conspirator who plead guilty prior to trial] informed her that Richard Green had taken the checks out of the mailboxes and that Patterson had served as a lookout while Green was doing so." Id at 157. On appeal, the Eighth Circuit agreed with the appellants that the complained of testimony was inadmissible hearsay.

> The statements made by Donald Patterson to Lorretta Johnson appear to have been casual comments which were neither intended to further nor had the effect of furthering the conspiracy in any way. The statements were not "in furtherance" of the conspiracy and therefore did not qualify for admission under Fed R Evid 801 (d) (2) (E). Id at 158.

Similarly, the Second Circuit in United States v Lang, 589 F 2d 92 (2d Cir 1978), ruled the pertinent proffered conversation was not "in furtherance" of the alleged conspiracy and consequently, inadmissible under Rule 801 (d) (2) (E) of the Federal Rules of Evidence. In this case, the defendant Nathan Lang, nick-named "Cool Breeze", was convicted of possession of counterfeit currency in violation of 18 USC § 472.

The testimony presented at trial indicated "Cool Breeze", while visiting Rikers Island, a New York penal institution, was found in the possession of the pertinent federal reserve notes. The alleged supplier of the counterfeit bills was Ronson Carey, who was not present at trial.

6

In addition, a tape recording had been made of a conversation between Carey and

an undercover agent to whom Carey had sold counterfeit bills originating from the same plates as

the bills found in the defendant's possession.

> Considerably bowdlerized, the tape conversation in issue here contained statements by Carey that Cool Breeze had gone to Rikers Island "all dust up and high" (according to expert testimony street jargon meaning under the influence of a hallucinogenic drug); that he had the counterfeit bills with him at that time; that he had been "busted" (arrested) "juggling" (dealing) with him through his girl friend…who was his "contact" (middle person). Id at 95.

The district court deemed the conversation admissible under, inter alia, Rule 801

(d) (2) (E), apparently accepting the government's theory "Carey was the co-conspirator of Lang

and his statement was made in the course of and in furtherance of the conspiracy." Id at 99.

However, the Court of Appeals disagreed, concluding it could not "reasonably find that Carey's

conversation with [the undercover agent] was 'in furtherance' of the conspiracy." Id at 99.

> The "in furtherance" requirement is mandated by the case law, Dutton v Evans, 400 US 74, 81 91 S Ct 210, 27 L Ed 2d 213 (1970); Wong Sun v United States, 371 US 471, 490 83 S Ct 407, 9 L Ed 2d 441 (1963); Krulewitch v United States, 336 US 440, 443-44, 69 S Ct 716, 93 L Ed 790 (1949), and has been specifically retained as a requirement in Rule 801 (d) (2) (E) and the rejection of the Model Code-Uniform approach [which scrapped the requirement] should be viewed as mandating a construction of the 'in furtherance' requirement protective of defendants, particularly since the Advisory Committee was concerned lest relaxation of this standard lead to the admission of less reliable evidence." 4 Weinsteins's Evidence, supra, at ¶ 801 (d) (2) (E) [01] p. 801-147.
>
> The taped conversation simply revealed that Carey knew that Lang had been arrested with counterfeit money supplied by Carey and that [the undercover agent] warned Carey to be careful in his future dealing with Lang. The Government's theory that his in some way advanced the interest of alleged conspiracy between Lang and Carey rests upon the argument that it is in Lang's interest to have Carey continue in business. It is suggested influence of drugs would somehow blunt any future negative reaction by [the undercover agent] to the purchase of more counterfeit. The argument is totally unpersuasive. We think that the district court's initial but not ultimate reaction was sound: "I don't know whether it was in furtherance of the objectives of the conspiracy for to say that one of his previous customers had been arrested with such bills, that might be counter-productive." We agree and find that he conversation cannot sensibly be viewed to advance the interests of any conspiracy between Carey and Lang.

7

> Lang was a purchaser who was at least temporarily out of business and Carey's conversation with [the undercover agent] did nothing to advance any venture in which Lang was concerned. In fact, it would, if anything, discourage any future dealings between the two. There is no evidence that Lang had any interest whatsoever in any other business Carey might have. The conversation indicated that Lang was a bad risk and this advanced no interest of the Appellant, or his alleged co-conspirator. Id at 99-100.

Furthermore, in United States v Lieberman, 637 F 2d 95 (2d Cir 1980), Myron Lieberman had been convicted of conspiracy to distribute and to possess with intent to distribute marijuana, 21 USC § 846. On appeal, the appellant contended, inter alia, certain testimony had been erroneously admitted pursuant to Rule 801 (d) (2) (E) of the Federal Rules of Evidence.

On December 2, 1978, agents of the Drug Enforcement Administration intercepted a shipment of marijuana as it was being unloaded from a van belonging to Lieberman Movers, a household moving firm which was operated by the defendant. The pertinent evidence against the appellant came from Messrs. Flynn and Hamilton, two (2) former employees of Lieberman Movers who testified as to a conversation they overheard on November 29, 1978 between Willie Gaines (the warehouse foreman and an alleged co-conspirator) and John Briggs (the driver of the intercepted van).

The government argued the testimony of the "conversation was properly received against Lieberman as non-hearsay evidence because it was a conversation in furtherance of the conspiracy." Id at 102. The United States Court of Appeals for the Second Circuit disagreed.

> We are not persuaded…that the Gaines-Briggs conversation was "in furtherance of" the conspiracy. This conversation began with Gaines telling Briggs he had heard Briggs arrive at Lieberman Movers the night before; Briggs professed surprise because he had not arrived until 9:p.m.; Gaines stated he had been in the warehouse packing the dishpacks [cartons] and that Lieberman had told him not to open the door for anyone. The conversation as thus described by both Flynn and Hamilton smacks of nothing more than casual conversation about past events. It is difficult to envision how it would have furthered the conspiracy. The government urges us to construe the conversation as "Gaines way of indicating to his co-conspirator Briggs that [Lieberman] thought secrecy to be imperative and

8

that there should be no discussion of the matter in the presence of other employees who were standing around the loading dock exhibiting curiosity about the 46 cartons stacked against the wall." (Brief on Appeal 14). We are unconvinced. First, we note that Gaines' statements in the conversation were entirely retrospective, especially as to Lieberman's instructions. Discussion, in the context of this conversation, of an instruction that related expressly to a time since past does not appear to be intended to further an ongoing conspiracy. Moreover, as we read the testimony of Flynn and Hamilton, it was Gaines who initiated the conversation. And he did so with Hamilton standing next to and other employees nearby. Neither Flynn nor Hamilton indicated that any conspiratorial air had been exhibited or that the employees were admonished not to be inquisitive. If Gaines' goal had been to ensure that there be no discussion in the presence of the employees, he could readily have achieved that simply by not starting the conversation.

The requirement that the statements have been in furtherance of the conspiracy is designed both to assure their reliability and to be consistent with the presumption that the co-conspirator would have authorized them. McCormick's Handbook of the Law of Evidence, [645 (2d ed 1972)]. The requirement is not satisfied by a conversation such as the one here, which amounted to no more than idle chatter. United States v Birnbaum, 337 F 2d 490 (2d Cir 1964); see 4 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 801 (d) (2) (E) [01], at 801-174 (1979).

Since we have rejected the contention that Gaines' statements were made in furtherance of the conspiracy, the testimony by Flynn and Hamilton as to these statements must, insofar as Lieberman is concerned, be classified as hearsay. Id at 102-103 (Footnote omitted) (Emphasis added).

In United States v Johnson, 927 F 2d 999 (7th Cir 1991), the appellant had been convicted of fraud in obtaining loan applications for students enrolled in a beauty school. On appeal, Ms Johnson "contend[ed, inter alia], that the trial court improperly admitted against her an exchange between [co-conspirator] Echols and James Shanks, a student..." Id at 1000. The Court of Appeals agreed.[2]

Echols' statement was improperly admitted against Johnson because it was not made "in furtherance of" the conspiracy. Rule 801 (d) (2) (E) is a "limitation on the admissibility of co-conspirators' statements that is meant to be taken seriously." Garlington v O'Leary, 879 F 2d 277, 283 (7th Cir 1989) (emphasis in original).

---

[2] The appellate court also rejected the government's contentions the statements were made to have Shanks join a "conspiracy of silence," Id at 1002, or were admissible under a quasi-adoptive-state-of-mind-theory, Id at 1002-1003.

*        *        *

Echols' statement to Shanks was not part of any "normal information flow between co-conspirators." [United States v Doerr, 886 F 2d 944, 952 (7th Cir 1989)]. Shanks was not a conspirator. Shanks had engaged Echols in casual conversation shout Shanks' plans for the future. Echols was only commenting on Shanks' hypothetical business plan and did not intend by his remark to further any objectives of his own scheme. Mere "idle chatter," narrative declarations and superfluous causal remarks are not statement in furtherance of conspiracy. Id at 951. This is true even when, as here, the declarant makes what can be construed as an offhand admission of culpability. See United States v Posner, 764 F 2d 1535, 1538 (11th Cir 1985) ("a letter that 'spilled the beans' regarding the tax scheme could hardly certiorari denied, 476 US 1182, 106 S Ct 2915, 91 L Ed 2d 544; United States v Eubanks, 591 F 2d 513, 520 (9th Cir 1979) (a "casual admission of culpability to someone [the declarant] had individually decided to trust" is not furtherance of the conspiracy). Id at 1001-1002.

Moreover, in United States v Birnbaum, 337 F 2d 490 (2d Cir 1964), the United States Court of Appeals for the Second Circuit again concluded the testimony preferred pursuant to the "co-conspirator exception" to be inadmissible hearsay. In that matter, the defendant-appellant "was found guilty of bribing Internal Revenue Agent Harold Simon (count three) and of conspiracy with Simon and other to do so (count one). Simon was named a co-defendant but before trial pleaded guilty to the counts in which he was named. Id at 491.

> The indictment was four counts.. Count one charged in substance that co-defendant Birnbaum and Simon conspired with Alexander L. Guterman, Robert J. Eveleigh and Robert C. Leonhardt, named as co-conspirators but not as defendants, to violate 18 USCA §§ 201, 201 and 26 USCA § 7213, in that as part of the conspiracy Simon would receive from Birnbaum and the other conspirators greater sums than were authorized by law to induce him to corruptly examine the tax returns of Guterman and his wife, Leonhardt and his wife and of McGrath Securities Corporation. Count two, against Simon alone, charged that in April, 1957, he received a sum greater than authorized by law, namely $10,000 and 5,000 shares of stock of Shawn Development Corporation for a determination favorable to the taxpayers of taxes owing by Guterman for 1955 and 1956 and by Leonhardt for 1954 through 1957, in violation 26 USCA § 7214 (a) (2). Count three alleged that Birnbaum gave $10,000 and 5,000 shares of Shawno stock to Simon in violation of 18 USCA §§ 2 and 201. Count four alleged that on October 9, 1961, Simon received $1,250 for the determination favorable to the taxpayers of taxes owing the United states by Leonhardt for 1954 trough 1957 and by McGrath Securities for 1953 through 1956, in violation of 26 USCA § 7214 (a) (2). Id at 491-492 (Footnotes omitted).

10

It was a portion of the government's proofs that after the inception of the alleged scheme, "Birnbaum informed Leonhardt that he (Leonhardt) was going to have to pay some $200,000 more than Birnbaum had earlier anticipated. Leonhardt only agreed, however, to pay $10,000 then and 'five or six later on if [he] could afford it.'". Id at 493. Thereafter, "Leonhardt gave Birnbaum the $10,000 in cash." Id at 493.

Subsequently, "Leonhardt told the Federal Bureau of Investigation of the Simon bribery. Then, acting in cooperation with federal authorities Leonhardt arranged a meeting with Simon...and at that time told him that he would be able to pay more of the money, although he thought the amount unfair." Id at 494. Simon's reply, according to Leonhardt, was as follows:

> Well, it was my own fault because he had made direct contact with me, and from the very first day I sent him to Birnbaum, that Birnbaum had declared himself a partner in the deal and that Birnbaum had kept most of the money, and he had told me this before over the years, but this time he was very emphatic about the thing, and I requested permission to go confront Birnbaum and say, "You kept my money, you know. Either give it to the man or give it back to me." Id at 494 (Emphasis added).

On appeal, one of the errors claimed by Birnbaum was the admission of the emphasized portions of the above-stated testimony. It was his contention, inter alia, that said declarations were not made "in furtherance" of the alleged conspiracy. The Court of Appeals agreed and reversed the conviction.

> On its face, Simon's statement appears to be no more than his account of the facts of Birnbaum's past activities. However the Government suggests that the statement was made in furtherance of the conspiracy, and, therefore, competent against Birnbaum. Thus, it is argued that the purpose of Simon's statement about Birnbaum's past double-dealing was to induce Leonhardt to honor his part of the bribery scheme by paying the balance the money he owed. On these facts, such a construction is too tenuous to admit this evidence. Compare United States v Annuziato, [293 F 2d 373 (2d Cir 1961), cert denied, 368 US 919, 82 S Ct 240, 7 L Ed 2d 134 (1961)] where the payment concerning which the hearsay statement was made way in the future. "[T]he fact that one conspirator tells another something relevant to the conspiracy does not alone make the declaration

11

competent; the declaration must itself be an act in furtherance of the common object; mere conversation between conspirators is not that...United States v Nardone, 106 F 2d 41, 43 (2d Cir), rev'd on other grounds, 308 US 338, 60 S Ct 266, 84 L Ed 307 (1939). This evidence should not have been received.

The result we reach on these facts comports with the agency rationale that has traditionally supported the co-conspirators hearsay exception. [3] Declarations of a co-conspirator (Simon) are competent against an absent defendant (Birnbaum) because they are a part of the execution of the plan, and have been impliedly authorized by the others." United States v Kelly, 105 F 2d 912, 916 (2d Cir 1939); see Lutwak v United States, 344 US 604, 617, 73 S Ct 481, 97 L Ed 593 (1952); United States v Olwiess, 138 F 2d 798, 800 (2d Cir 1943); Van Riper v United States, [13 F 2d 961, 967 (2d Cir 1926), cert denied sub nom. Ackerson v United States, 272 US 702, 47 S Ct 102, 71 L Ed 848 (1926)]. Simon's accusation, however, fell well outside the scope of his authority as a conspiratorial agent of Birnbaum and can hardly be said to bear Birnbaum's implied authorization. Obviously, Birnbaum would not want Leonhardt to know that he had converted any of the funds Leonhardt had given to him for Simon. Id at 495 (Emphasis added).

Consequently, a statement which is "'merely [a] narrative' declaration of a past fact" is not admissible pursuant to Rule 801 (d) (2) (E). Id at 495. Accord: United states v Borelli, 336 F 2d 376 (2d Cir 1964) United States v Annunziato, 293 F 2d 373 (2d Cir 1961), cert denied, 368 US 919, 82 S Ct 240, 7 L Ed 2d 134 (1969); United States v Compagna,146 F 2d 524 (2d Cir 1944), cert denied, 324 US 867, 65 S Ct 912, 89 L Ed 1422 (1945); United States v Goodman, 129 F 2d 1009 (2d Cir 1942); Van Riper v United States, 13 F 2d 961 (2d Cir 1926), cert denied sub nom. Ackerson v United States, 273 US 702, 47 S Ct 102, 71 L Ed 848 (1926).

Furthermore, in United States v Wilson, 490 F Supp 713, 716 (ED Mich 1980), several defendants were charged with "conspiracy to defraud Medicaid, to commit mail fraud, and to make false statements." (Footnote omitted)

According to these charges, the unlawful activity was effectuated by various employees of the C. Wilson Medical Association Laboratory who sent fictitious

---

[3] This traditional "limited agency" approach was specifically retained by the drafters of the federal evidentiary rules. Weinstein's Evidence, supra, at ¶801 (d) (2) (E) [01] at 801-170 et seq.

12

blood specimens to Advance Laboratory. Thereafter, various Advance employees allegedly fabricated laboratory test results from these specimens (or non-existent specimens). This Laboratory practice has been consistently characterized as "sink testing"....Additionally, the Indictment charges that Advance employees performed, and reported, tests which were not required by treating physicians. It was also alleged that Advance paid [Oliver] Wilson, and the Wilson Laboratory for certain referrals made by Wilson to Advance to further this illicit result. Id at 716.

At trial, the government sought to adduce from one Raymond Ratliff a conversation he had with the defendant Edward Urbanski, when the latter visited the Damon Corporation headquarters in Boston. Apparently, "when the Damon Corporation learned of sink testing occurring at Advance (its wholly owned subsidiary), it dispatched Ratliff and other Damon officials to pay a surprise visit to Advance. A few days later, Urbanski flew to Boston to discuss the situation at Advance with Ratliff." Id at 716.

The purported testimony would have revealed "that Urbanksi made what Ratliff characterized as 'confessions'. These alleged 'confessions' involved Urbanski's acknowledgment that there were instances of sink testing occurring at Advance." Id at 716.

The government argued, inter alia, the testimony was admissible pursuant to Rule 801 (d) (2) (E) of the Federal Rules of Evidence. The Honorable Julian Abele Cook disagreed.[4]

> The Court reiterates its position that the statement of Urbanski was not one made "in furtherance" of the conspiracy, even under the most expansive application of that phrase. Narrative declarations, like the one involved here, have never been considered to be make in furtherance of a conspiracy. Urbanski was merely telling Ratliff what had occurred- he in no way was attempting to draw Ratliff into the conspiracy or otherwise further it. Id at 717. (Footnote omitted).

Moreover, the Ninth Circuit Court of Appeals was confronted with a similar situation in United States v Fielding, 630 F 2d 1537 (9th Cir 1980). In that case, Carl Fielding

---

[4] The Court also held the pertinent testimony, if admitted, would have violated the defendant's Sixth Amendment Confrontation Clause rights. Id at 717-718.

13

was convicted of importation of marijuana, 21 USC §§ 812, 952, 960 (a) (1), (b) (2), and conspiracy to import marijuana with intent to distribute, 21 USC §§ 846, 953.

The prosecution involved an allged smuggling scheme which utilized the ship "Osprey" to import marijuana, with appellant supposedly managing statewide operations while others ran the actual importation activities. In pertinent part, the government's case primarily consisted of the testimony of David Wagner, an informant working for the government, and Dixon McClary, a special agent of the Drug Enforcement Administration, both of whom essentially recounted declarations made to them by Robert and Rafael Flores, two (2) brothers who were allegedly co-conspirators.

> David Wagner met Fielding only once and was unsuccessful in eliciting any incrimination statements from him. Subsequently, Wagner met the Floreses in Los Angeles, and, introducing himself as a big dealer, told them he was interested "in doing a scam just like the one Carl [the appellant] was engaged in". The main source of Wagner's testimony was Boby Flores, a twenty year old "loader" for the Osprey. Wagner testified that Flores tried to impress him with his ability to deliver.
>
> At this first meeting Wagner attempted to initiate a new transaction, but was told that there was trouble with appellant because he had not paid Bobby some $68,000 from an earlier trip which had been undertaken during the course of the conspiracy. Wagner offered his assistance, which was accepted, in collecting the debt. "They were trying to get paid, trying to find Carl…or anything along those lines.
>
> Q: And the purpose for which you were asked to do this was what?
>
> A: Because ostensibly I would be buying marijuana from them in Mexico in the future and doing the trip with sailboats.
>
> Q: And what was their purpose in asking you to help them?
>
> A: They were having troubles with Carl and needed any corollary assistance I could give them.
>
> The Floreses and Wagner went to Seattle and, at the airport, met Agent McClarry. During this period, Wagner testified, Bobby Floreses spoke generally about the conspiracy; a lot of his comments "were narrations of things that they had done in the past." Flores' statements connected appellant to the conspiracy. Bobby "didn't like the way Carl dealt, he didn't like having to be on the dole and coming up to Seattle for a few thousand dollars all the time."
>
> Dixon McClary, special agent for the Drug Administration, met Wagner and the Floreses at the Seattle Airport. He too testified as to the airport conversations. He noted that the Floreses were there "to settle a financial dispute

14

that they had with Carl Fielding." The Floreses came with two other persons enlisted as "muscle" and were planning to use physical force against appellant. McClary and Wagner talked them out of the use of force and refused to provide them with a machete. Id at 1363.

Neither of the Floreses testified a trial. Over the objections of the defendant, the lower court "allowed the testimony, indicating that since the discussions with the Flores [sic] took place prior to the arrival of the Osprey on its last trip and related to payment for earlier trip which was encompassed by the charged conspiracy, the statements were 'in furtherance' of the conspiracy and did not violate the Confrontation Clause." Id at 1364. The Ninth Circuit disagreed and reversed.[5]

> [T]he admission for the statements in the present case was clear error. The statements can be characterized as either (1) narrative of past activities, (2) puffing to induce Wagner to join in a new conspiracy, (3) a conspiracy to commit assault or otherwise obtain money from appellant Fielding. As defined in the indictment, the existing conspiracy was a conspiracy to import marijuana with intent to distribute it from the period of September, 1973, to September, 1974. General statements made by Flores to Wagner concerning his business relationship with Fielding in no way advanced that conspiracy. As Wagner admitted, Flores was trying to impress him in order to facilitate a new deal involving a new conspiracy that did not include appellant. Specific statements concerning payments allegedly due to Flores similarly are not statements that advance the common objectives of the conspiracy, i.e., objectives of the Flores [sic] and Fielding.
>
> Appellee insists that payment was part of the charged conspiracy. It is of course true that importation of marijuana is rarely an eleemosynary endeavor but is usually conducted for profit. Such an observation, however, does not aid in analysis of the facts of the present case. To the degree that Flores confided in Wagner, it was not the purpose of insuring the profit of all co-conspirators (a common object of the conspiracy to import) but to force Fielding to pay funds allegedly due from him to Flores. Clearly, such a purpose was in furtherance of the declarant Flores' purpose in joining the conspiracy, but not Fielding's. Moreover, if this activity could in some way be considered a part of the conspiracy, the statements made the activities engaged in (including the attempt to get a machete) cannot be said to advance the common goals of the conspiracy. Statements made by Flores to obtain muscle realistically appear to be the criminal

---

[5] Not only did the Court conclude the pertinent proofs were inadmissible under Rule 801 (d) (2) (E), Id at 1364-1366, it further held their admission violated the defendant's Sixth Amendment Confrontation rights, Id at 1366-1369.

15

analog to a suit in equity for a dissolution of profits, not negotiations for extending the life of the partnership. Id at 1365 (Emphasis supplied by the Court)

Furthermore, in United States v Eubanks, 591 F 2d 513 (9th Cir 1979), appellants were convicted of conspiracy to distribute heroin and to possess heroin with intent to distribute in violation of 18 USC §§ 841 (a) (1) and 846. On appeal, it was contended, inter alia, the trial court, over objection, erroneously admitted prejudicial hearsay testimony.

> At trial the defense raised numerous hearsay objections to the testimony of the prosecution's star witness, Gloria Baca. Baca's deceased common-law husband, Luis Gonzales, Jr., had played a key role in the alleged conspiracy to distribute heroin. The alleged conspirators had often met Gonzales in Baca's presence and Gonzales often contacted them over the phone in the home where Baca and Gonzales lived. Baca testified about the actions of the alleged conspirators, about statements she had heard them make to one another, and about what Gonazales told her about the alleged conspiracy. Id at 518.

The Court initially noted the government's position "that those portions of Baca's testimony that related to what she saw or did were not hearsay." Id at 518. However, after conducting an extensive analysis of Rule 801 (d) (2) (E), the Ninth Circuit concluded "most of the statements made by Gonzales to Baca that incriminated appellants [could not]reasonably be considered to have been in furtherance of the conspiracy." Id at 520.

> Gonzales and Baca had been living together in a common-law marriage relationship. Gonzales often discussed his activities with Baca, who did not participate in the alleged conspiracy until long after its inception. Baca testified that Gonzales told her that he was going to Tuscon to obtain narcotics from Yanez [a defendant]. There is no evidence that Gonzales' statement was a declaration in furtherance of the conspiracy. Gonzales was not seeking to induce Baca to join the conspiracy and his statement did not assist the conspirators in achieving their objectives. Gonzales' "statement was, at best, nothing more than [a] casual admission of culpability to someone he had individually decided to trust." United States v Moore, 522 F 2d 1068, 1077 (9th Cir 1975).
> Similarly, when Gonzales informed Baca about the persons to whom he had spoken over the telephone, he was not making a declaration in furtherance of the conspiracy. Instead, he was merely informing his common-law wife about his activities. When Baca phoned Yanez' home in Tuscon to speak with Gonzales, she was told by Yanez' wife, Elouise, that Gonzales was with Yanez. This

16

<u>statement also was not made in furtherance of the conspiracy, and thus it should
not have been admitted under the co-conspirator exception to the hearsay rules.</u>

After Baca began travelling to Tucson with Gonzales and assisted him with the
arrangements for obtaining heroin, she assumed a role in the alleged conspiracy.
<u>Yet Baca's participation in the conspiracy did not convert Gonazales' statements
to her into declarations in furtherance of the conspiracy.</u> Most of Gonzales'
statements to Baca that were included in her testimony <u>did nothing to advance the
aims of the alleged conspiracy.</u> At one point, Gonazales told Baca that Yanez had
arranged their trip to Tucson. On another occasion, Gonzales told Baca that they
were going to Phoenix together to pick up some heroin from Leroy [another
defendant]. At another time, Baca was informed by Gonzales that Fred [Eubanks,
a third defendant] and Mel had been unable to pick up any heroin. While eating at
Denny's in Arizona, Baca heard Yanez say that he was going to meet with Leroy.
<u>There is no indication in the record that these statements were any more than
conversations between conspirators that did nothing to advance the aims of the
alleged conspiracy.</u> The incriminating references to absent persons were not
designed to induce Baca's continued participation in the conspiracy or to allay her
fears....
    Because there was nothing in the record to support the inference that the
various statements made by Gonzales to Baca were made in furtherance of the
conspiracy, the trial should not have admitted them over objection under the co-
conspirator exception to the hearsay rules. <u>Id</u> at 520-521. (Emphasis added).[6]

Moreover, statements to a law enforcement officer, "made after the

coconspirator's arrest," are "not in furtherance of the conspiracy." <u>See generally,</u> <u>United States</u> v

<u>Kindle,</u> 925 F 2d 272, 277-278 (8th Cir 1991).

---

[6] In addition to holding Gonzales' statements were inadmissible hearesy, the
Court also noted "a contrary ruling would raise serious questions about whether appellants were
denied their Sixth Amendment confrontation rights by the introduction of the Gonzales'
statements." <u>Id</u> at n. 8

17

Respectfully submitted,


/s/ Arthur Jay Weiss
ARTHUR JAY WEISS (P 25225)
Attorney for Defendant PIATEK
30445 Northwestern Highway
Suite 330
Farmington Hills, Michigan 48334-3102
(248) 855-5888
arthurweiss@ajweisslaw.com

Dated: February 22 2012.

18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                              Case No. 2: 10-cr-20123

        Plaintiff

                             HONORABLE VICTORIA ROBERTS

-vs-

D-7 THOMAS WILLIAM PIATEK,

        Defendant
_____/

## CERTIFICATE OF SERVICE

ARTHUR JAY WEISS, counsel of record for THOMAS WILLIAM PIATEK, a Defendant in the above-entitled matter, hereby Certifies that on the 22nd day of February 2012, he served all counsel of record with a copy of Defendant Piatek's Trial Brief Re: The "In Furtherance" Requirement of Rule 801 (d) (2) (E) of The Federal Rules of Evidence and Certificate of Service relative to the above-entitled matter by electronic means.

                        /s/Arthur Jay Weiss_____
                        ARTHUR JAY WEISS (P 25225)
                        Attorney for Defendant PIATEK
                        30445 Northwestern Highway
                        Suite 330
                        Farmington Hills, Michigan 48334-3102
                        (248)855-5888
                        arthurweiss@ajweisslaw.com